SWEENEY *v.* SWEENEY.

1. DIVORCE—CUSTODY OF CHILDREN—MODIFICATION OF DECREE.
   The court granting a divorce decree has authority to modify the decree as to the care and custody of minor children of the parties as the best interests of the children require, and it is its duty to do so where changed conditions or facts not disclosed upon the original hearing clearly show that the rights of the parties and the welfare of the children demand it.[1]

2. SAME—CUSTODY OF CHILDREN—MODIFICATION OF DECREE—APPEARANCE OF PROSECUTING ATTORNEY.
   On a bill for divorce, where, subsequent to a decree giving the divorced wife the care and custody of the parties' minor children, a petition is filed by the husband for a change of such care and custody on the ground that the wife is not a fit person for such care and custody, and the hearing is acrimonious, with bitter charges and recriminations between the parties seeming to overshadow the question of the interests of the children, the case should not be disposed of without appearance of the prosecuting attorney under the statute on behalf of the children.

Appeal from Kent; Brown, J.   Submitted January 12, 1917.   (Docket No. 155.)   Decided May 31, 1917.

Bill by Lillian Sweeney against Laverne G. Sweeney for divorce: On petition of defendant for a modification of the decree respecting alimony and the custody of the children.   From an order dismissing the petition, defendant appeals.   Reversed.

*John W. Powers,* for plaintiff.

*Nichols & Shaw,* for defendant.

[1]On modification of decree of divorce because of changed conditions, see note in 44 L. R. A. (N. S.) 1026.
   On effect of second marriage upon obligation to pay alimony, see notes in 62 L. R. A. 974; L. R. A. 1915F, 820.

STEERE, J.  Defendant appeals from an order of the Kent county circuit court in chancery dismissing his petition for the custody of his and plaintiff's two children and for relief from an order previously made requiring him to pay her $25 a month alimony.

These parties were married in 1902, and on September 25, 1912, plaintiff obtained a *pro confesso* decree of divorce from defendant in which it was adjudged that she should have the care, custody, and education of their "minor children, Glen Sweeney, eight years old, and Miles Sweeney, four years old, the issue of said marriage, until they respectively attain the age of fourteen years," or until the further order of the court.  Defendant paid the monthly alimony as provided in the decree until February, 1916, amounting in all to $1,135.  In the meantime he had remarried, was again divorced and again married to a third wife, with whom he was living at the time of this hearing. This petition, filed on February 29, 1916, sets out that, because of the sickness of his present wife and necessary expenses, he was unable to keep up payment of the alimony imposed, although he had for a long time allowed other bills to accumulate in order to pay the same, until he could not obtain further credit, and threatened garnishment proceedings imperiled his position with the Pere Marquette Railroad Company, for which he was working as a baggageman at $70 per month; that he was refused the privilege of seeing his children whom he was ready and willing to support and care for which he could properly do at much less expense, and he had ascertained that plaintiff was leading an immoral life, which the children, being then eight and twelve years of age, could realize and understand, for which reason he asked a modification of the original decree, granting him custody of the minor children and relief from payment of alimony.

Plaintiff's answer is a lengthy pleading, reciting various former delinquencies of defendant, charging that he is not a proper person to have the care and custody of the children, and denying that she has been guilty of improper or immoral conduct.

That the trial court had authority to modify the decree originally rendered in the case as the best interests of the minor children required cannot be questioned, and it would be the duty of the court to do so where changed conditions or facts not disclosed upon the original hearing clearly showed that rights of the parties and the welfare of the children demanded it.

Upon the hearing of this petition, on April 26, 1916, defendant testified that his increasing necessary expenses above his income had resulted in an indebtedness of $250 which his creditors were pressing, his then wife was sick at home, and it was necessary that he in some way provide for her; that he had no money or means of getting any before his next pay day on April 1st, when he would receive $35; that he did not want his boys brought up in a home where such things as he had learned of were going on, and if given their custody he thought he could properly care for and bring them up in a better manner in the home he now had; that because of the things he had heard he engaged his attorney, to whom he had paid but $10, to prepare this petition, which he swore to on information and belief, and with the knowledge of his attorney made arrangements early in February with a constable named Nichols, whom he had formerly known when a railroad man, to go up to plaintiff's place occasionally and see what he could ascertain. The attitude of the court towards the result of Nichols' investigation is defendant's most serious ground of complaint.

It was shown by the testimony that Nichols, who at times worked as a private detective, then proceeded

to investigate, and on the evening of Saturday, February 26th, while watching plaintiff's place, saw two men go in there and was able to see, just at the bottom of a drawn window curtain, what occurred and could also hear their conversation, hearing, amongst other things, an engagement for a meeting there the next Monday night, after one of the men had said he was going to be in the city until Tuesday; that he reported what he had seen and heard, and Monday night about 12 o'clock went back to the house with defendant and his attorney, where they found plaintiff, another woman, and two men under circumstances and in a condition the details of which may be omitted, but which if true fully justified defendant's charges.

While plaintiff admitted entertaining strangers at her home on the two occasions mentioned, she denied the more flagrant misconduct charged, but while on the stand did testify in answer to questions by defendant's counsel in part as follows:

"Two weeks ago last Saturday night I had some men there. One left about 11 o'clock, and the other left about 1 o'clock. The one that left the latest was the one that called to see me, and the one that left earlier called to see another lady that was there at the house. * * *

"*Q.* You had a lot of drinks?

"*A.* We had a lot of ginger, and we put a little whisky in it. * * * The young man who came to see me gave the name of Harry Jewell. He called me first over the telephone on the 17th day of February. I didn't see him until the 25th. I seen him on Saturday night and I seen him again on Monday night. I saw him the first time on Friday at the depot. He brought the whisky and ginger ale with him. * * *

"*Q.* Did you go to bed with either one of those men.

"*A.* We were in the bedroom. The bedroom is downstairs, and there is a window at the side of the house. We were all in the bedroom, but I was not in the bed. * * * I had on my underclothes, my kimona, and my nightgown. * * *

"*Q.* Now, this fellow, how much did he have on?
* * *

"*A.* He had on his underclothes, his pants, and his socks.

"*Q.* Now, as a matter of fact, all four of you people were in bed.  * * *

"*A.* No, sir; we were on the bed, and we were not under the covers.

"*Q.* Well, you were drinking pretty freely, weren't you?

"*A.* We had one bottle of wine.  * * * We told stories that I will admit we should not have told in company."

In justification of her conduct, it was charged that this affair was the result of a conspiracy on the part of defendant, his attorney, and the detective to blacken the woman's character by procuring the two men found with her and the other woman to go there as they did.

Early in the hearing, while defendant's counsel was cross-examining plaintiff as to her condition and conduct on the night in question, the court said:

"Wait a minute, let me ask something.  So far as you know, Mr. S——, so far as your client has advised you, did you know anything about any attempt on the part of anybody that these young men should go up there?"

This was answered in the negative, with the explanation that a detective had been engaged to watch and investigate, who reported what he had learned. The court examined counsel sharply upon the subject, though not under oath, who positively denied any knowledge of or participation in an attempt to "put up a job on this woman," as the court termed it.  At the conclusion of counsel's emphatic denials, the court, apparently on the theory that plaintiff was defendant's wife, said:

"I will say this thing unhesitatingly, that if a husband or his attorney conspires with persons to make a date

with a man's wife, and after a certain amount of opposition, through the instrumentality of the agents of the plaintiff or the husband in the case, the wife finally does something that is indiscreet, or something that is worse than indiscreet, if the husband is a party to it he hasn't got clean hands. * * * The frailties of human nature won't stand for anything of that kind charged up to the court."

Subsequently, the court severely examined defendant and Nichols, who positively denied under oath any knowledge of the two men found at plaintiff's house before they were discovered there, or any participation in or knowledge of any plan or conspiracy to induce improper conduct on the part of plaintiff, asserting the two men were absolute strangers to them and on that evening, when found at defendant's home, refused to give their names, although one replied he was a traveling man and they were stopping at the Morton House, and subsequent efforts to locate them had been unsuccessful. The court, however, arrived at the "unescapable conclusion" that Nichols arranged with the men found there to go out and give "an opportunity to go in and catch them with these women." A careful study of this record leads to the impression that the trial court may have had before it facts which the record does not disclose; but, assuming such was the case, we are unable to adopt the court's conclusions that her conduct with those men was therefore involuntary and not detrimental to the home environments of her children. Its influence upon them would be the same whether voluntary or involuntary. In discussions occupying several pages of the record, the court said in part:

"It does not appear now that there was anything that the children had knowledge of, that they were upstairs, and, if this was a designed conspiracy to involve this woman, it probably never will happen again in the world. I hope it never will. If she was guilty

of this offense voluntarily, allowed these men to come there voluntarily, if I felt that she entered into this thing without having it put in her way, I would not hesitate a minute to take these children away from her. * * * Mrs. Sweeney has made here in court certain very damaging statements, no question about it; and the only thing that the court takes into consideration is that it has the earmarks of a very put-up job on this woman, that these men were induced to go there by the husband or somebody for him. * * * If I can help this woman by taking advantage of this circumstance which is a mighty unfortunate one for her—I am not shielding her a particle. She is guilty of conduct that, if it was her natural and uninvited conduct, I would not hesitate a minute to take the children away from her."

The hearing in this matter was unfortunately acrimonious, with bitter charges and recriminations between the parties which, as they developed, seem to have overshadowed to a degree the vital question of the best interests of the minor children. The court dismissed defendant's petition, with language indicating the case was disposed of largely on the theory that the shown dissolute conduct of the mother of these children was imputable to defendant's machinations and therefore involuntary, and adjudged defendant guilty of contempt in not paying the alimony due in February.

We are impressed that this controversy should not be finally disposed of until the minor children are properly represented by the prosecuting attorney appearing in their behalf under the statute which authorizes such action and requires service of process upon the prosecuting attorney in divorce cases where there are minor children. Whether his appearance was entered in this case in its inception we are not advised. It is not shown that a copy of this petition was served upon him. The purpose and spirit of the statute is that, in the public interest and for the wel-

fare of the children, the court shall have the independent aid of disinterested counsel, impartial between the contending parents, to investigate the facts and present to the court the true situation, so far as the best interests of the children are concerned.

The record presents a situation where the services of the prosecuting attorney, who could independently investigate the facts and impartially present them to the court, would be particularly helpful.

The order dismissing defendant's petition and adjudicating him guilty of contempt will be set aside, without costs to either party on this appeal, and the case remanded, with directions that a copy of the petition be served upon the prosecuting attorney, who shall appear for the minor children and be heard in their behalf before final disposition of said petition.

KUHN, C. J., and STONE, OSTRANDER, BIRD, MOORE, BROOKE and FELLOWS, JJ., concurred.